IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| KARL GRAULICH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WILLBROS GROUP INC., S. MILLER WILLIAMS, MICHAEL J. FOURNIER, DANIEL E. LONERGAN, MICHAEL C. LEBENS, PHIL D. WEDEMEYER, and W. GARY GATES,<br><br>Defendants. | Civil Action No. _____<br><br>COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934<br><br>JURY TRIAL DEMANDED |

Plaintiff Karl Graulich ("Plaintiff"), by and through his attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

**NATURE OF THE ACTION**

1. This action stems from a proposed transaction (the "Proposed Transaction" or "Merger") announced on March 28, 2018, pursuant to which Willbros Group Inc. ("Willbros" or the "Company") will be acquired by Primoris Services Corporation ("Primoris") through its wholly owned subsidiary, Waco Acquisition Vehicle, Inc. ("Merger Sub").

2. On March 28, 2018, the Company's Board of Directors (the "Board" or the "Individual Defendants") caused the Company to enter into an Agreement and Plan of Merger (the "Merger Agreement") with Merger Sub.  Pursuant to the terms of the Merger Agreement, Merger Sub will purchase each issued and outstanding share of Willbros common stock for $0.60 in cash (the "Merger Consideration"), for a total preliminary equity value of approximately $37.5 million,

or a total enterprise value of $107.6 million. Upon completion of the Merger, Merger Sub will merge with and into Willbros, with Willbros surviving the merger as a wholly owned subsidiary of Primoris.

3. On April 11, 2018, Defendants (as defined below) filed a preliminary Proxy Statement on Schedule 14A with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction (the "Proxy"). As described herein, the Proxy omits certain material information with respect to the Proposed Transaction, which renders it false and misleading, in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 140.14a-9 ("Rule 14a-9") promulgated thereunder.

4. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' wrongdoing described herein.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

6. This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, solicits shareholders in, and/or maintains operations within, this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

**PARTIES**

8. Plaintiff is, and has been at all times relevant hereto, the owner of Willbros common stock.

9. Defendant Willbros is a Delaware corporation, with its principal executive offices located in Houston, Texas. Willbros common stock is listed on the Over-The-Counter ("OTC") under the symbol "WGRP."

10. Defendant S. Miller Williams ("Williams") has served as a member of the Company's Board since May 2004, and was appointed non-executive Chairman effective December 1, 2015.

11. Defendant Michael J. Fournier ("Fournier") was elected President and Chief Executive Officer and appointed to serve on the Board in December 2015.

12. Defendant Daniel E. Lonergan ("Lonergan") has served as a Board member since July 2010.

13. Defendant Michael C. Lebens ("Lebens") has served as a Board member since May 2011.

14. Defendant Phil D. Wedemeyer ("Wedemeyer") has served as a Board member since April 2015.

15. Defendant W. Gary Gates ("Gates") has served as a Board member since February 2017.

16. The defendants listed in ¶¶ 10-15 are collectively referred to herein as the "Individual Defendants."

17. The Individual Defendants and Willbros are referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

18. According to the Company's Form 10-K for the year ended December 31, 2017, Willbros "is a specialty energy infrastructure contractor serving the power and oil and gas industries with offerings that primarily include construction, maintenance and facilities development services." The Company has three segments: Utility, Transmission and Distribution ("UT&D"); Canada; and Oil & Gas. UT&D segment provides "a wide range of services in electric and natural gas transmission and distribution ("T&D"), including comprehensive engineering, procurement, maintenance and construction, repair and restoration of utility infrastructure." As to the Canadian segment, the Company "is an industry leader in construction, maintenance and fabrication." The Oil & Gas segment provides "construction, maintenance and lifecycle extension services to the midstream markets."

19. On March 28, 2018, Willbros issued a press release announcing that it has entered into a definitive agreement to be acquired by Primoris for $0.60 per share for all of the outstanding common stock of the Company. Accordingly, the Proposed Transaction's preliminary equity value is approximately $37.9 million and the enterprise value is approximately $107.6 million. The press release further stated the following:

> Under the terms of the all-cash agreement, Primoris will pay $0.60 per share for all of the outstanding common stock of the Company, settle the existing debt obligations of the Company, and provide up to $20 million in bridge financing to support the Company's working capital liquidity needs through the closing date. The transaction has been unanimously approved by the Boards of Directors of both companies, is not subject to a financing condition, and is anticipated to close during the second quarter of 2018, subject to Company stockholder approval and certain other closing conditions.
>
> Michael Fournier, President and CEO, commented, "Primoris has a strong North American presence, and its diversified offerings complement our existing businesses. Many of our existing customers are familiar with Primoris

4

and its various operating companies. We believe the broad, national presence of Primoris will allow us additional opportunities for growth. We anticipate that our businesses will benefit from the stability provided by Primoris' solid balance sheet and access to capital.

In the near term, our focus is on meeting our clients' expectations, working safely, and providing the quality of service they have come to depend on from the Company. We see significant synergies and opportunities when the Company joins Primoris after the anticipated closing of this transaction."

In connection with the execution of the definitive agreement, certain of the Company's directors and stockholders, representing approximately 17% of the Company's outstanding shares, entered into voting agreements with Primoris in which they have agreed, among other things, to vote in favor of the transaction.

20. As stated in the press release, Primoris was able to get approximately 17% of Willbros stockholders to enter into voting agreements to vote in favor of the Proposed Transaction. Specifically, (i) certain affiliates of Kohlberg Kravis Roberts & Co. L.P., and (ii) certain directors and officers of Willbros entered into separate voting agreements with Primoris ("Supporting Stockholders"). Pursuant to the voting agreements, the Supporting Stockholders, representing approximately 17% of the total voting power of Willbros, will vote in favor of the Merger.

21. The offer price of $0.60 per share in cash is significantly below the Company's 52-week high stock price of $3.29 per share, and the 52-week median stock price of $2.04 per share. Also, the offer price is below the Company's book value of $1.36 per share. In addition, the offer price is below an analyst target price of $1.00 per share for Willbros.

22. On March 28, 2018, the Company filed a Form 8-K with the SEC detailing the Proposed Transaction, and included the Merger Agreement dated March 27, 2018. According to the Merger Agreement, if the Proposed Transaction is terminated under certain circumstances, Willbros shall pay Primoris a non-refundable termination fee in the amount of $4,300,000 in cash.

5

The termination fee represents 11.3% of the preliminary equity value which is significantly above the norm and might have a chilling effect on other potential bidders.

23.     In soliciting shareholder approval for the Proposed Transaction, the Company filed the Proxy on April 11, 2018, which purports to contain a summary/overview of the Proposed Transaction, but omits certain critical information, rendering portions of the Proxy materially incomplete and/or misleading, in violation of the Exchange Act provisions discussed herein.  As a result, Willbros shareholders lack material information necessary to allow them to make an informed decision concerning whether to vote in favor of the Merger.

24.     In particular, the Proxy contains materially incomplete and/or misleading information concerning, *inter alia*: the financial analyses performed by the Company's financial advisor, Greenhill & Co., LLC ("Greenhill"), in support of its fairness opinion.  As part of Greenhill's fairness opinion, Greenhill reviewed, among other things, "certain information, including financial forecasts for the year ended December 31, 2018." Proxy at 44.

25.     The Proxy states that in rendering its fairness opinion, Greenhill performed a *Selected Comparable Company Analysis* by looking at selected companies and by dividing them into two subsets, five peers in the utility transmission & distribution sector business and five peers in the oil & gas services business.  For this analysis, the Proxy notes that Greenhill "reviewed the ratio of enterprise value" "plus the book value of debt, plus minority interest, less cash and cash equivalents, less investments in unconsolidated affiliates, as a multiple of earnings from operations before interest expense, income taxes and depreciation and amortization" for 2017 and 2018.  Proxy at 46-47.  As part of the *Selected Comparable Company Analysis*, "Greenhill applied such ranges of multiples to the corresponding financial information for the Company, and, as a result, arrived at high and low implied Share prices for the Company." Proxy at 47.  Interestingly, one

6

of the four implied valuation ranges, EV/2018E Pro Forma Adjusted EBITDA was $0.89 per share to $1.81 per share which is significantly above the $0.60 per share offer price. The Proxy fails to disclose the multiples for each of the ten selected companies including the actual 2017 equity value/earnings before interest, taxes, depreciation and amortization ("2017A EV/EBITDA") and the estimated 2018 equity value/earnings before interest, taxes, depreciation and amortization ("2018E EV/EBITDA").

26. Disclosure concerning the *Precedent Transactions Analysis* portion of Greenhill's fairness opinion fares no better. For this analysis, Greenhill "compared selected transactions since 2013 in the utility and transmission and distribution sector ("UT&D Precedent Transactions") and the oil and gas services sector ("Oil & Gas Precedent Transactions")." Proxy at 48. As part of the *Precedent Transactions Analysis*, Greenhill identified eight transactions in the UT&D sector and eleven transactions in the Oil & Gas sector. In respect to EV/EBITDA, the Proxy notes that Greenhill "reviewed the total transaction value for each of the Precedent Transactions and analyzed the EV implied by such total transaction value as a multiple of last 12-month EBITDA (for the 12-month period to the fiscal quarter in which the applicable transaction was announced)." Proxy at 48.

27. However, the Proxy fails to disclose the multiples for each of the nineteen selected precedent transactions including the equity value/earnings before interest, taxes, depreciation and amortization ("EV/EBITDA") multiple for each of the precedent transaction. The multiples for each of the nineteen selected precedent transactions would be material to Willbros shareholders in deciding how to vote their shares. As previously noted, the real value of Greenhill's work is not in its conclusion, but in the valuation analyses that underpin that result. It is those analyses that are crucial for shareholders evaluating the merits of the Merger. Without such information, it is

difficult for Willbros shareholders to evaluate if the precedent transactions are comparable to this Proposed Transaction which has an equity value of $37.5 million, or an enterprise value of $107.6 million.

28.     The Proxy also omits any information concerning a discounted cash flow (DCF") analysis. Specifically, the Proxy fails to disclose whether a DCF analysis was even done by Greenhill in connection with its fairness opinion in respect to this Proposed Transaction. If a DCF analysis was not performed in connection with this Proposed Transaction, the Proxy should disclose affirmatively that a DCF analysis was not performed and an explanation as to why it was not done.

29.     While the Proxy discloses that the Company's financial "projections were not prepared with a view to compliance with generally accepted accounting principles" ("GAAP"), and the projections included "certain non-GAAP financial measures," the Proxy fails to disclose if there was any reconciliation of GAAP and non-GAAP figures and what that reconciliation was. Proxy at 50.

30.     The non-disclosed information discussed above, would be material to Willbros shareholders in deciding how to vote their shares, as the real informative value of the financial advisor's work is not in its conclusion, but in the valuation analyses that buttress that result. When a financial advisor's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion, as well as the key multiples and range of multiples used in those analyses, must also be fairly disclosed.

31.     Further, the non-disclosed information discussed above prevents shareholders from understanding the context of the figures or consider whether any of the inputs thereto or ranges

8

derived therefrom are anomalous. Absent this information, Willbros shareholders are unable to determine whether the Proposed Transaction is indeed fair and in their best interest.

32. Without the foregoing material disclosures, Willbros shareholders are unable to fully understand and interpret Greenhill's financial analyses or the fairness of the Merger Consideration when determining whether to vote in favor of the Proposed Transaction.

33. There are also material omissions in the Proxy concerning the process leading up to the Merger.

34. For example, as part of the background and chronology of events that led to the Proposed Transaction, on November 27, 2017, the Board and the Company's financial advisor, Greenhill discussed two potential strategic alternatives: "a stand-alone recapitalization of its existing debt structure or a potential sale transaction." Proxy at 25. During the Board meeting, there were discussions involving the Company having "received inbound inquiries from two privately-held infrastructure construction companies (Party A and B) in September 2017 and October 2017 indicating their interest in pursuing a potential transaction." *Id*. As a result, the Board instructed "Greenhill to pursue recapitalization and sale process and also to further explore a potential transaction with Party A or Party B," and also, authorized "Greenhill to conduct a broad search of both strategic and financial buyers" to see if a transaction that would be the best for the Company and its stockholders can be achieved. *Id.*

35. Following the November 27, 2017 Board meeting, at the direction of the Board, Greenhill "initiated exploratory discussions with approximately 57 potential acquirers and stand-alone recapitalization investors, including 15 strategic parties and 42 financial parties." *Id*. Greenhill also "contacted eight potential ABL lenders." *Id*. Out of the 65 potential acquirers, stand-alone recapitalization investors, and ABL lenders, 23 potential acquirers and the eight

9

potential ABL lenders signed non-disclosure agreements ("NDAs"). Party A and Party B both signed NDAs. However, the Proxy fails to disclose the material terms of the NDAs as it is relevant to shareholders to know whether certain potential acquirers received different terms in their respective NDAs. Without the terms of the NDAs disclosed, it is difficult for shareholders to determine whether parties to these agreements were provided with the same right to submit confidential proposals following news of a definitive merger agreement, or whether these NDAs contained standstill provisions, and if so, whether the standstill provisions had don't-ask-don't-waive ("DADW") provisions[1] and/or sunset provisions, or whether the counterparties could seek a waiver of such standstills to make an unsolicited offer to acquire the Company.

36. If these NDAs entered into by certain potential acquirers contained standstill provisions, these parties are likely prohibited from coming forward with a topping bid if waivers do not exist in the NDAs.

37. The omission of the details regarding these NDAs in the Proxy renders it materially misleading because it gives the false impression that the counterparties who had entered into negotiations with the Company prior to its signing of the Merger Agreement have the ability to come forward with a topping bid, when they may, in fact, be contractually prohibited from doing so. Thus, the omission of this information renders all references to the NDAs in the Proxy materially false and misleading.

38. Also, while the Proxy discloses that "19 potential acquirers performed due diligence," it fails to disclose how many out of the 19 potential acquirers were strategic parties and

---

[1] A DADW provision prohibits potential acquirors from even *asking* the target to waive the standstill prohibitions to allow them to submit topping bids. Several courts have noted that DADW provisions violate a target board's duty to act reasonably, in an informed matter, and in furtherance of the goal of seeking the highest possible sales price, and therefore have ordered injunctive relief when a danger existed that such clauses prevented superior bids from arising.

how many were financial parties. *Id*. Further, the Proxy fails to disclose whether any of the eight potential ABL lenders performed due diligence.

39. In the beginning of December 2017, the Company's management and Greenhill participated in several discussions and exchanged information with Party A where "Party A submitted an initial non-binding indication of interest, in which it proposed an all-stock merger between Willbros and Party A through which the stockholders of Willbros would own 20% of the combined company." Proxy at 26. Willbros would continue as a publicly traded company. Around the same time, the Company's management held an introductory meeting with Party B where "Party B outlined its proposal for a potential all-stock merger transaction in which Willbros' stockholders would own 33.8% of the combined company." *Id*. Similar to Party B's proposal, Willbros would continue as a publicly traded company.

40. Also, in the beginning of December 2017, Greenhill provided its first weekly update to Fournier. The Proxy simply states that the updated report by Greenhill included Greenhill's contacts with potential buyers and capital providers and potential ABL lenders, but the Proxy fails to disclose whether these contacts were brand new potential buyers and capital providers and potential ABL lenders or they were part of the 65 original potential acquirers as previously discussed in the Proxy.

41. On December 4, 2017, Greenhill contacted Primoris "to explore Primoris' interest in a potential acquisition of Willbros." Proxy at 26. The Proxy states that on December 4, 2017, Primoris signed an NDA, but again the Proxy fails to disclose the terms of the NDA with respect to Primoris. Significantly, the Proxy fails to disclose whether the NDA entered into by Primoris is the same NDA entered into by other potential acquirers including Party A and Party B. Thus, it

is unclear whether Primoris received certain and/or additional rights in its NDA, not given to other potential acquirers that signed their respective NDAs.

42. Significantly, the Proxy also fails to disclose whether the Board, the Company's management and/or Greenhill had previously contacted Primoris to discuss a potential transaction to purchase Willbros. Also, the Proxy fails to disclose whether Primoris was one of the original 57 potential acquirers.

43. After Greenhill presented Primoris with preliminary materials and held initial discussions with the senior management team of Primoris, including its President and CEO for over ten days, on December 28, 2017, Primoris "submitted a proposal to acquire Willbros in a merger transaction for an enterprise value of between $120.0 million and $145.0 million in cash," with an addition of a stock component as consideration if Willbros "deemed that preferable." Proxy at 26.

44. On January 10, 2018, the Company's management and Greenhill had discussions with Party A's management, including its President and CEO. Two days later, Fournier met with Party C and other potential financial sponsors. Party C was "a private equity firm specializing in buyouts, corporate carve outs and turnarounds." Proxy at 27. During the same week, the Proxy discloses that Party A, Party B, Primoris and other parties were provided access to the Company's virtual data room. However, the Proxy fails to disclose the names of the "other parties" that received access to the data room. The Proxy fails to disclose whether Party C received access to the Company's virtual data room. *Id.*

45. Without the foregoing material information, the Company's shareholders will not be able to fully understand and interpret the financial analyses, including their impact on the

fairness of the Merger Consideration, when determining whether to vote in favor of the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

46. Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Willbros (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

47. This action is properly maintainable as a class action for the following reasons:

    a. The Class is so numerous that joinder of all members is impracticable. As of March 26, 2018, there were 63,221,610 shares of Willbros common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

    b. Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have violated Sections 14(a) and 20(a) of the Exchange Act in connection with the Proposed Transaction; and (ii) whether Plaintiff and the Class would be irreparably harmed if the Proposed Transaction is consummated as currently contemplated and pursuant to the Proxy as currently composed.

    c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

    d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

    e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of

the Class which would establish incompatible standards of conduct for the party opposing the Class.

      f.    A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

      g.    Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate.

## CAUSES OF ACTION

### COUNT I

**Claim for Violation of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder
(Against All Defendants)**

48. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

50. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that solicitation communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

51. Rule 14a-9 further provides that, "[t]he fact that a proxy statement, form of proxy

14

or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made." 17 C.F.R. § 240.14a-9(b).

52. As discussed herein, the Proxy misrepresents and/or omits material facts concerning the Merger.

53. Defendants prepared, reviewed, filed and disseminated the false and misleading Proxy to Willbros shareholders. In doing so, Defendants knew or recklessly disregarded that the Proxy failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54. The omissions and incomplete and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote their shares. In addition, a reasonable investor would view such information as altering the "total mix" of information made available to shareholders.

55. By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxy, Defendants were undoubtedly aware of this information and had previously reviewed it, including participating in the Merger negotiation and sales process and reviewing Greenhill's complete financial analyses purportedly summarized in the Proxy.

56. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger.

57. Willbros is deemed negligent as a result of the Individual Defendants' negligence

in preparing and reviewing the Proxy.

58.     Defendants knew that Plaintiff and the other members of the Class would rely upon the Proxy in determining whether to vote in favor of the Merger.

59.     As a direct and proximate result of Defendants' unlawful course of conduct in violation of Section 14(a) of the Exchange Act and Rule 14d-9, absent injunctive relief from the Court, Plaintiff and the other members of the Class will suffer irreparable injury by being denied the opportunity to make an informed decision as to whether to vote in favor of the Merger.

60.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II

### Claim for Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

61.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

62.     The Individual Defendants acted as controlling persons of Willbros within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Willbros, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

63.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

64. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. They were thus directly connected with and involved in the making of the Proxy.

65. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14d-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons and the acts described herein, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

66. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

67. Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class Representative and Plaintiff's counsel as Class Counsel;

B. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C. Directing the Individual Defendants to disseminate an Amendment to its Schedule 14A that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Directing Defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 24, 2018

Respectfully submitted,

_____
Jeffrey W. Chambers

**WOLF POPPER LLP**
711 Louisiana St. Ste. 2150
Houston, Texas 77002
Tel: 713-438-5244
Fax: 212-486-2093
jeffchambers@chambers-law-group.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**WOLF POPPER LLP**
Carl L. Stine
Fei-Lu Qian
845 Third Avenue
New York, New York 10022
Tel.: 212-759-4600
Fax: 212-486-2093
Email: cstine@wolfpopper.com
         fqian@wolfpopper.com